Parker, J.
The undisputed facts in this case are as follows: Several years prior to February 3d, 1896, the decedent, Henry Schultz, was in the employ of the Lake Shore & Michigan Southern *641 Railway Company as a target or switch tender, at East Toledo, Ohio. The station where he was employed was about fifty feet east of the railroad bridge over the Maumee river, and was on the north side of and dose to the tracks. At that point-the Lake Shore Railroad, has two main tracks: that upon the north is used generally for trains bound east, that upon the south, for trains bound west. About seventy-five feet_ east of the target or semaphore — as it is called by some of the witnesses —or about one hundred feet from it, taking the course that seems to have been pursued by decedent upon the occasion when he was injured, there is a switch-stand by which a switch connecting the tracks of the C. H. & D. railway with the trac s of the Lake Shore & Michigan Southern Railway is operated. The tracks of the O. H. & D. Railway ran in an easterly direction from the switch, parallel with the tracks of the Lake Shore & Michigan Southern Railroad for a short distance, and then bear off tb the south.
It was a part of the decedent’s duty to manage the target and switch so as-to control the movements of the C. H. & I). trains and locomotives in passing from the tracks of the one railroad to the tracks of the other. As a rule, trains bound east passed over the north track of the Lake Shore & Michigan Southern Railway, and trains bond west passed over the south track. But in certain emergencies requiring it, trains bound east were permitted to use the south or - west-bound track, and trains bound west were permitted to use the north or east-bound track. But when trains were permitted to pass from the union depot past the station where decedent was at work over the west-bound track, it was customary for those in control of such movements of trains or locomotives to give the switchman in charge of this station timely notice of such movements, so that he might govern himself accordingly in the performance of his duty. And trains passing east of the west-bound track were, in the common parlance of the railroad men, on the wrong track.
The importance and necessity of such notification to the switchman at this point and to others along the line, who, by signals controlled the running of the trains, is ar once apparent. Unless such notice were given, collisions and other accidents must be inevitable and frequent. It was important that such n -tice should be given to the person at this point who controlled the passing of trains from the tracks of the C. H. & D. Railroad to those of the Lake Shore & Michigan Southern Railroad, so that he might prevent collisions of the trains of the one road with those of the other.
A telephone system had been in use for some time for the transmission of these notices. It seems that in some instances the notice came to the men at their target directly from a station near the union depot at the west of the river. At other times, the notice was sent to the East Toledo station, perhaps half a mile east of this track, and was, by the agent there, transmitted to the switchmen at this target. But, however sent, the evidence discloses that it was in no case omitted. One witness who was employed at this target for several years says that he never knew of a failure to give notice; and there was no evidence that it was ever omitted prior to the occasion when the decedent was injured.
*642 The night of the 3d of February was cold and sleeting. Decedent went on duty, relieving another switch ! tender a few minutes before six A. M., his time of service being from six A. M. to six P. M. At that time it was foggy and dark and the ground was icy and slippery. The telephone wires seem to have been out, of order, so that for about three hours preceding his going to work no messages could be sent to this station. There is no evidence that decedent was aware of this. The east-bound track had become blocked at a point some distance east of this target — but not within view from that point —so that it became necessary that morning to send trains from the union depot eastward over the west-bound track as far as a'certain station called Rockwell station, and a train had proceeded by this course less than an hour before decedent went on duty ; but it does not appear that he knew of that.
A train, consisting of a locomotive, four baggage cars and six passenger coaches, was sent eastward from the union depot at about 6 A. M. over the west-bound track. This was a daily train, and this was its usual time of departure. At about the same time a locomotive approached this switch from the south and east on the C. H. & D. Railroad, and signaled for the switch, as was the custom at about this hour, so that it might go to the union depot and pull out a train due to leave on the C. H. & D. Road at about seven A. M.
Decedent had not been notified of the approach of the L. S. & M. S. train'from the west over the west-bound track, and no reason being apparent to him why he should not permit this C. H. & D. locomotive to go upon the west-bound L. S. & M. S. track and proceed eastward thereon to the union depot, he so adjusted the semaphore as to signal such permission, and then, with his lantern in his hand, he proceeded westward to the switch-stand to throw the switch so that the C. H. & D. locomotive might go upon the L. S. <ft M. S. west-bound track. Before decedent had thrown the switch, the east-bound Lake Shore & Michigan Southern train passed by at a rate of from twenty-five to thirty miles an hour, struck him, threw him to the south of the south track, inflicting- injuries upon him from which he died within a day or two.
There is some question in the testimony as to whether deceased acted properly in signaling the C. H. & D. locomotive by semaphore that it would be permitted to go upon the L. S. & M. S. track before adjusting the switch so that it might so proceed; it being insisted on behalf of the railroad company that the switch should have been placed first and the semaphore signal given afterwards, and that after the locomotive had passed the switch it should have been readjusted by the deceased, thus making necessary two trips from the semaphore to the switch-stand, whereas, the method adopted required but one trip.
We think it is clearly established by the evidence that deceased pursued the proper and customary course; that the other course would not have been so convenient or so safe, either for him or for those operating the trains of the companies, or for the property of the companies. If the switch had been set first, the C. H. & D. locomotive could not have proceeded until the semaphore signal had been given. In the meantime a train or locomotive might have approached over *643 the L. S. & M. S. track going west on the west-bound track, and observing that the semaphore, its guide, gave it the track, it might have run off at the switch-stand. Other disasters not necessary to mention might have resulted naturally from such course. Proceeding as he did, decedent gave warning to west-bound trains on the west-bound track that the target had been given to the C. H. & D. train or locomotive, so that such west-bound train would stop and wait until the switch had been re-set and semaphore signal changed.
As to whether the semaphore serves as a signal to trains bound westward over the east or west-bound tracks, there is some dispute. On behalf of the defendant in error it is contended that it was set up and maintained as a signal to such trains that the west-bound track was given to the O. H. & D. Mr. Polle, the engineer operating the locomotive that struck and killed decedent,'testified that as he crossed the railroad bridge and approached this station, he looked out for the semaphore to see if the track was clear for him. However that may be, he did not pause or slow down until after he had passed the semaphore and until he had struck decedent. There is other evidence tending to show and we think fairly shows that as a precaution against accidents trains approach-' Ing this station in either direction on the wrong track were accustomed to receive a lantern, flag or other signal from the switchman in charge before proceeding on their way; and it is clear that this L. S. & M. S. engineer on this occasion re^ ceived no such signal.
That this engineer proceeded without this signal is not alleged as negligence or as a ground of recovery; but it is nevertheless significant and entitled to consideration in its bearing upon the conduct of decedent, as will be pointed out further on.
It is alleged and insisted that the company was negligent in that it failed to notify decedent that this L. S. <& M. S. train was about to proceed eastward on the west-bound track,and in not providing and enforcing a rule whereby such notice should be given, even though the telephone lines were out of order.
It appears that such notice had been given about twenty-five minutes before the departure of the train, by telephone or telegraph, to the agent at the station about one half a mile east of this target, and that thereupon it became the duty of such agent to notify the decedent by telephone; that this agent attempted to send a telephone message of the fact to his station, but could not do so as he found, because the lines would not work, and being provided by the company with no messenger or other means of sending the notice, and being without instructions as to how he should proceed in such emergencies, having no further duty to perform under his instructions, he did nothing more. It appears that this agent knew that the telephone had been out of order for something like three hours before he attempted to send this message.
' We are of the opinion that the failure of the company to provide means for conveying such notice to decedent under the circumstances amounted to negligence on its part. We are of the opinion that the failure to give such notice was the proximate cause of the accident. Doubtless this rule or custom of giving such notice was adopted primarily for the safety of the *644 trains, the persons controlling and riding upon them, the property of the company and that being carried by the company, etc., and that it was not for the protection of the track-men, switchmen and the like. But the rule or custom having been adopted and followed for a long time without interruption or deviation, one in the situation of the decedent, having knowledge of the fact, would naturally and might properly rely confidently upon the rule being observed. The fact of the evident necessity of such notice being given would add to the assurance that it would be given. The danger of appalling ■disaster resulting from the omission to give such notice was so great and so apparent that one advised of the fact and to whom the notice must come would feel entirely sure that a train would not be sent out on the wrong track without notice, and he would naturally proceed with his work about and upon the tracks with a feeling of entire security that he might be at work upon the west-bound track without looking for approaching trains from the west, or upon the east track without looking for west-bound trains upon that track, unless he had notice that such trains were coming upon the wrong track.
Under the circumstances it became therefore the duty of the railroad company to the decedent to give him such notice, and it was negligence as to him to fail to give such notice, and the •obligation was commensurate with the danger arising from the situation; so that therefore it became the duty of the railroad company to provide against its omission, when caused by -such probable circumstances as the disabling of its telephone lines on sleety, stormy nights. In other words, one in the situation of the decedent had a right to rely upon notice being-given him by other means, or at least upon notice that the lines were out of order and therefore he must exercise unusual vigilance. By way of illustration as to what might have resulted from the omission to give such notice, as it has been pointed out in argument by counsel for defendant in error, if this switch had been opened only a moment earlier, the westbound C. H. & D. train would have proceeded westward and would have met this east-bound M. S. & L. S. train perhaps upon the bridge, which was near by, with probable results that one trembles to contemplate, and the fault would not have been that of the switchmen or the trainmen, but solely that of those who failed to provide adequate means of giving the switchman timely notice of the approaching east-bound train over the west-bound track.
But it is urged on behalf of the plaintiff in error that the defendant was guilty of Contributory negligence in that he saw this train approaching and failed, because of inattention or confusion, to get out of its way; or, if he did not see it coming, that he must have known it was coming, must have heard it and should have turned and looked to see which track it was coming on; and that he was negligent in walking upon the track under those circumstances.
If, as contended by plaintiff in error, decedent was crossing over the track near the switch, with his side to the approaching train so that he could not fail to see it, the conclusion that he was negligent in his movements is almost irresistible. But after a careful consideration of the evidence bearing upon the movements of the deceased, we conclude that it justifies *645 the finding that will support the verdict; that is that after setting the semaphore for the C. H. & D. locomotive, the deceased walked southward to the centre of the south track and continued eastward without turning or pausing, walking between the rails of the south-bound track and near the switch-stand where he was overtaken and struck by the east-bound train.
It is said that he should have looked in both directions before going upon the track, and that if he had done so he would have discovered the approach of this east-bound train upon the west-bound track. As I have said, it was dark and foggy; while he was passing over this distance of about one hundred feet, taking the course that he pursued, the train must have passed over — considering its rate of speed — about seven times as great a distance; and it is apparent from the evidence as to the conditions upon that night that it would have been difficult, if not impossible, for one going upon the track, with a train from five to seven hundred feet distant, to discover whether it was upon the south or the north track. The tras» must have been at least that far from him at the time he went; upon the track. There is no positive evidence, we have only the circumstances to indicate whether he did, in fact, look as he stepped upon the tracks and turned and walked toward the east.
Considering the icy condtion of the ground, the impending-danger of one walking elsewhere between the semaphore and the switch-stand, and the fact that he had no reason to anticipate a train coming east upon the west-bound traok,it cannot be said as a matter of law that decedent was guilty of negligence in walking there.
That one may, under certain circumstances, walk upon the tracks without being chargeable with negligence, has bee» held in Ohio in the 50 Ohio St., page 136, and in the case of Railroad Co. v. Ford, decided by this court at the present term. 18 C. C., 239.
• Doubtless deceased heard the approaching train, and that he supposed it was on the right track is evident from the fact that he kept steadily on his way -on the west-bound track, and from the further fact that he gave the trainman no signal with his lantern either to stop or come on, as the rules required of him where a train was proceeding upon the wrong track.
We are clear that we should not disturb this verdict, either on the question of negligence or contributory negligence.
What was said by Judge King in the Ford caséis appropriate to be repeated here.’ The circumstances of the two cases are in many respects, quite similar. He says: “The fact that this engine was running upon the wrong track should be taken into consideration in determining whether decedent was negligent; also the customary manner of doing business. We think all these things should go to the jury. The case is peculiarly a, question of fact, from, which the jury were entitled to draw inferences of negligence. We do not see how the court, if the coprt below properly instructed the jury^we do .not see how. a reviewing court,could reverse it,” Again:' “We think o» both of these questions of negligence, or the negligepce of both parties, it is a casé peculiarly for the jury,and that we are not authorized to disturb their verdict, in finding that the defend *646 ant was negligent and that the decedent was not guilty of negligence which contributed to his injury.”
The next question arising in the case is upon certain requests •made of the court below to charge the jury,and what occurred in that direction. Beading from the record, it appears that after the testimony was all in, this occurred: “Thereupon the defendant by its counsel and before argument to the jury, requested the court to give to the jury in charge the following requests. This was not understood by the court: see finding of facts hereiriafter’.” And further along in the bill of exceptions it appears that after the jury had been charged by the court — whether before or after it had retired, does not clearly appear— counsel for the plaintiff in error insisted that his certain requests (which I need not take the time to read) should be sent to the jury, and there was some discussion between counsel and the court as to what had occurred upon these requests being submitted to the court, counsel for the defendant in error objecting to these written requests or proposed instructions going to the jury. Afterward however, this objection was withdrawn and those which the court gave of the requests made, were sent to the jury, so that that part of what was complained of in the proposed action of the court was disposed of as requested by plaintiff in error. Then, with respect to the matter,this appears in the bill of exceptions: “In the matter of the requests, the facts are these: A day or two before the argument began, counsel for the defendant presented his requests to the court and stated to the court that he wished the court to examine them and to either give or refuse them before argument, stating also that he was not particular in having them read to the jury before the argument, but that he wanted to know before the argument what requests would be given and what refused, and he wished said requests treated in all respects as requests given or refused before tbe argument. The court did not understand this request. íhe understanding of the court was that they were ordinary requests to go into the charge,and the court understood that Mr. Potter simply desired to know before the argument what requests the court would give in the general charge and what he would not give”. How this misunderstanding arose it is impossible to find as a matter of fact. Now it appears that there are certain of these requests which were not given by the court in the precise language in which they were submitted by the counsel for plaintiff in error, and we think the requests correctly state pertinent rules of law, and it is insisted by counsel for plaintiff in error that since it was his desire and request that these requests should be treated in all respects as requests given or refused before argument, the modification of the language of these requests in the charge of the court was error upon the part of the court, though the propositions as modified are also correct statments of the law.
We are of the opinion, however, after considering the whole matter, that it was somewhat the fault of counsel for plaintiff in error that his request was not distinctly understood by the court; that the language he used, the form of his requests, was such as might have misled the court. We think therefore, it would not be right for this court to reverse the court below on account of its modification of these charges in its general *647 charge, since counsel did not take the pains to use language that would make him distinctly understood by the court. We cannot see that any real prejudice resulted or could have resulted to counsel, though, of course, if this matter had been insisted upon and he had made his desire distinctly known, he had a right to have his requests given precisely as he had written them, so long as they embodied the law.
There was no exception to the charge, and the modifications of the requests are not so material as to affect, as we can see, the rights of the plaintiff in error. The charge appears to be full and fair, and the law is correctly given; and therefore we do not feel that we would be justified in reversing the judgment on account of what was done, growing out of this misunderstanding between counsel and the court.
Objections were made to questions and answers in the course of the examinations of witnesses; motions to rule out were overruled and exceptions taken to the ruling of the court. With respect to these matters we have carefully examined all such questions as have been brought to our attention-by counsel in oral argument and in briefs, and while we do not give our unqualified approval to all of the course pursued on the trial of the case, we cannot see that anything occurred here that was very material, or that could have prejudiced the rights of the plaintiff in error.
It is contended on behalf of the railroad company that the verdict is excessive. The decedent was about fifty-two years of age. He was earning about forty dollars a month; he contributed to his 'family and those who are beneficiaries represented here, perhaps from three hundred to three hundred and fifty dollars per year. It is pointed out to us that by the Carlisle tables, a sum somewhere between $2,500 and $3,500 would have purchased an annuity which would have brought as great an income to the decedent or his family during the probable number of years of the continuance of the decedent’s life.
With respect to the use of annuity tables in this connection, while we are of opinion that they may be resorted to as a guide, we feel satisfied with the expression of this court upon that subject in the case of the Toledo Street Bailway Company v. Mammet, Adm'r, found in the 13th Circuit Court Beports, 591. I will read a few words from the opinion of Judge King, at page 601:
“It is certainly true, in my judgment, that the court has no right, in passing upon a verdict under this statute, to apply to it any rule from any table of probability; the jury does not necessarily base their verdict upon fixed mathematical tables, and it is not the object and intention of the statute that they should; but they shall give such sum as they deem reasonable, in proportion to the pecuniary injury.”
Upon the subject of a court of review in a caste of this character disturbing the verdict on account of the amount of damages awarded, I desire to read briefly from a decision of Judge Hammond, of the federal court, in the case of Smith v. Pittsburgh & Western Bailway Company, on page 113 of the last Weekly Bulletin. In the third syllabus this is said:
“A verdict should not be set aside simply because it is excessive in the mind of the court, but only when the excess is *648 shocking to a sound judgment and a sense of fairness to the defendant. Where there is any margin for a reasonable difference of opinion in the matter, the view of the court should yield to the verdict of the jury, rather than the contrary.”
Potter & Emery, for Plaintiff in Error.
Hurd, Brumback & Thatcher, for Defendant in Error.
Judge Hammond in the course of his opinion gives the utterances of a number of very able judges upon this subject, and among other quotations, I find this — being the language of Mr. Justice Story in a case cited:
‘‘But if it should clearly appear that the jury have committed a gross error, or have acted upon improper motives, or have given damages excessive in relation to the person or the-injury, it is as much the duty of the court to interfere, to prevent the wrong, as in any other case.”
Now we cannot say that it is apparent from this record that this verdict was made too large by reason of the influence of passion or prejudice, and therefore we are not required to reverse the judgment for that reason. But we think the verdict is far too much. In the Ford case, supra, decided by this court a few]dayb ago,the jury awarded the plaintiff $8250. The decedent in that case was about of the same age as the decedent in this-case. They were in substantially the same grade of service, and earning substantially the same wages. We think the verdict in that case came much nearer to the true and correct amount that should have been awarded than the verdict of the-jury in this case. Yet, as is said in the syllabus I have quoted in the case last cited, ‘‘Whether there is any margin for a reasonable diffenee of opinion in the matter, the view of the court should yield to the verdict of the jury rather than the contrary,” and we think that rule should govern us, not only upon •the question whether we should set aside a verdict, but in fixing- the amount where we require a reduction of a verdict. We find it impossible to establish any rule that would be worthy of the name, by which we may determine what damages should be awarded in a given case of this character. It seems to us that the legislature might provide a rule that would result in a greater degree'of certainty or exactness, with out any injustice, by adopting some modified rule, based upon the Carlisle Tables or other tables of mortality. But since the legislature has not done this, we are not warranted in doing it. Perhaps it would be safer for the court to announce its conclusions upon the matter without undertaking to state very fully the reasons which governed it in arriving at such conclusions; since, if we should undertake to state reasons in this case, they might arise to plague us in some other case. Therefore we simply announce that it is our judgment that this verdict should stand for no more than $5,000, and the judgment will be affirmed if a remitter is entered for the amount in excess of $5,000, otherwise it will be reversed on account of excessive damages.
(Thereupon counsel for the defendant in error stated in.open court on tho hearing of this case that the defendant in eror makes the remitter suggested by the court.) -